OPINION OF THE COURT
Leonard N. Cohen, J.
"[TJhere was no room for them in the inn. ” (Luke 2:7.)
This is a motion by plaintiffs, a unit owner and president of the board of managers of a condominium known as Greentree at Murray Hill, located at 248 East 31st Street, New York, New York (the Condominium)* to temporarily enjoin defendants from operating a homeless shelter at Good Shepherd Episcopal Church (the Church) adjacent to the Condominium. By separate notices of cross motion, the defendant Church, the *503 defendant The Partnership for the Homeless, Inc. (the Partnership), and the city defendants, seek dismissal of the complaint for failure to state a cause of action.
"Am I my brother’s keeper?” (Genesis 4:9.)
This action involves important questions regarding who shall be responsible for our less fortunate brothers and sisters. Specifically, the action concerns the extent, if any, to which the court may or should be brought in as arbiter of a dispute involving the right of a church and its parishioners to exercise their religion and to practice Christian charity by temporarily sheltering the homeless and the rights of some of the adjacent property-owning residents who fear crime, drug sales, prostitution and a diminution of property values.
In June 1989, in response to the citywide need for emergency shelters for the thousands of homeless, the Church opened its doors to groups of 10 homeless men for temporary emergency shelter three nights a week, in cooperation with the defendant Partnership. The Partnership, a not-for-profit corporation, was founded in August 1982, by laypersons from various religious congregations with leaders of the major religious faith denominations, to provide the major interfaith response to the growing problem of homelessness in New York City. The Partnership presently includes a network of over 380 churches and synagogues in all five boroughs, as well as programs in other major cities across the Nation. The Partnership’s temporary homeless shelter city network currently embraces 147 church/synagogue shelters, including this Church, providing up to 1,600 homeless beds at the height of the winter and over 400,000 individual nights of temporary shelter annually.
Although the Partnership has a contractual relationship with defendant New York City Human Resources Administration (HRA), which provides approximately 17% of its operating budget, and less than 3% of its total budget, the bulk of its operating budget is funded from the private sector. The city, through HRA’s contract with the Church, provides only beds, linens, clothing, toiletries and cleaning supplies. The city’s Department of Buildings periodically inspects the space for compliance with relevant health and safety regulations. The city does not pay either the Partnership or the Church for its temporary sheltering of the homeless, nor does the city provide for any siting control. Sites for temporary shelters are *504 selected by the Partnership in cooperation with participating churches and/or synagogues.
The homeless men who are afforded temporary shelter at the Church are transported there by the city from the John Heuss Center, a drop-in center on Beaver Street in lower Manhattan, established by Trinity Parish. The men arrive between 9:15-9:45 p.m., and are picked up by bus the following morning at approximately 6:00 a.m. From the time of their arrival until their departure the following morning, the men are continually supervised and are not allowed to congregate in the street. The court notes that the Church also has a program which provides food for the hungry on Sundays (following the morning service) and on Fridays at lunchtime. That program — which is not the subject of this lawsuit — distributes bag lunches to approximately 100 guests on Sunday and between 50-75 on Friday. The funds are provided entirely by the parish and the work is done entirely by parishioners.
In opposition to plaintiffs motion to temporarily enjoin operation of its homeless shelter, and in support of its cross motion to dismiss the complaint, the Church has submitted affidavits by the Right Reverend Richard F. Grein, and Bishop Coadjutor and acting ecclesiastical authority of the Diocese of New York of the Episcopal Church, and by the Reverend Vincent Ioppolo, rector of the Church, attesting to their deep and sincere religious convictions underlying their participation in the homeless shelter program. They cite the teachings of Jesus and the Holy Scriptures and resolutions adopted by the Diocese at its conventions in 1973, 1981, 1983, 1984, 1985 and 1986.
The Bishop states: "While others may debate the root causes of hunger and homelessness and who should bear the ultimate responsibility for feeding and housing the victims, as Christians, we do not believe we have the leisure to turn our backs in the meantime on those in our midst who hunger, thirst or have no place to lay their heads.”
The rector of the Church states that: "[Cjaring for the poor and sheltering the homeless has consistently been part of religion in the Judeo-Christian tradition. The mandate to embrace and to minister to society’s outcasts is a lesson learnt [sic] from the Bible.”
The Bishop and rector cite bible chapter and verse in support of their position that sheltering the homeless is a religious obligation and an important outlet for its ministry.
*505 The Reverend Ioppolo also states that "the religious tradition of giving refuge to persons in need has its roots in Roman, medieval European and English common law. During the Middle Ages every church was a potential sanctuary. Religious sanctuary is an equally well-established practice in this country.”
Plaintiffs do not seriously question the sincerity of the religious convictions of the defendant Church or ascribe any but honorable motivations to its conduct in opening up its doors to the handful of homeless men three nights a week. However, they assert that the Church may not house the 10 homeless men because such use of the Church would constitute a violation of the applicable zoning resolution and the Church’s certificate of occupancy. Plaintiffs also claim that such use constitutes a public and private nuisance. Plaintiffs further argue that the use of the Church as a homeless shelter should be enjoined because the city: (1) failed to comply with the notice and public hearing requirements of Social Services Law §43 (11) and Environmental Conservation Law; and (2) failed to file an environmental impact statement (EIS), pursuant to ECL 8-0109 (4), and to otherwise comply with the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 et seq.) and the City Environmental Quality Review (CEQR) (NY City Executive Order No. 91, Aug. 24, 1977).
The complaint alleges five causes of action: (1) that the direct or indirect funding of the Church’s homeless shelter by the city violates the aforementioned laws, rules and regulations and would cause plaintiffs irreparable harm; (2) that the failure of the city to enforce said laws, rules and regulations causes plaintiffs irreparable harm; (3) private nuisance; (4) public nuisance; and (5) irreparable injury. Injunctive relief is sought as to each cause of action pending compliance with all applicable laws, rules and regulations.
As a threshold issue, the court holds that plaintiffs, as property owners immediately adjacent to the Church, have standing to seek judicial review of the city’s conduct without pleading or proving any special damages, because adverse effect or aggrievement can be inferred from their proximity to the Church (Matter of Sun-Brite Car Wash v Board of Zoning & Appeals, 69 NY2d 406, 409-410 [1987]).
The court first turns to the defendants’ cross motions to dismiss the complaint for failure to state a cause of action. On such a motion, the court must accept each and every allega *506 tian as true, without expressing any opinion as to whether a plaintiff ultimately will be able to establish the truth of these averments. If a plaintiff is entitled to a recovery upon any reasonable view of the stated facts, the complaint, as a pleading, is legally sufficient (219 Broadway Corp. v Alexander’s, Inc., 46 NY2d 506, 509 [1979]). The court’s inquiry is limited to ascertaining whether the pleading states any cause of action, and not whether there is evidentiary support for the complaint (Guggenheimer v Ginzburg, 43 NY2d 268, 275 [1977]). The complaint must be liberally construed in the light most favorable to the plaintiff, and all factual allegations must be accepted as true (Guggenheimer v Ginzburg, supra; Morone v Morone, 50 NY2d 481, 484 [1980]).
The plaintiffs argue as to the first and second causes of action that the Church is currently classified as a place of assembly, pursuant to section 27-254 of the Administrative Code of the City of New York, and, as such, it may only be used "for religious, recreational, political or social purposes, or for the consumption of food or drink or for similar group activities”. They argue that for the premises to be used legally as a shelter, it would have to be classified for "residential use”, pursuant to section 27-264 of the Administrative Code, which applies to "buildings and spaces that are primarily occupied for the shelter and sleeping accommodations of individuals on a day-to-day or week-to-week basis” (emphasis added). Plaintiffs further argue that a new certificate of occupancy is required "to ensure that the premises are safe for their intended use” and that the Church is being used as a hotel or motel contrary to the certificate of occupancy. They state that a new certificate of occupancy is therefore required because such "unauthorized and illegal use threatens not only the people staying within the Church but the adjoining property owners such as the plaintiffs herein.”
It has long been held that a church or synagogue may be used for accessory uses and activities which go beyond just prayer and worship (Matter of Community Synagogue v Bates, 1 NY2d 445, 453 [1956]). Section 12-10 of the New York City Zoning Resolution defines the term "accessory use” and relevantly states that such use:
"(a) Is a use conducted on the same zoning lot as the principal use to which it is related (whether located within the same accessory building or other structure, or as an accessory use of land) * * * and
*507 "(b) Is a use which is clearly incidental to, and customarily found in connection with, such principal use; and
"(c) Is either in the same ownership as such principal use, or is operated and maintained on the same zoning lot substantially for the benefit or convenience of the owner, occupants, employees, customers, or visitors of the principal use. ”
Such permissible "accessory uses” for a church or synagogue include a Sunday school, men’s and women’s clubs, youth and community centers (NY City Zoning Resolution § 12-10); a guest house for a rabbi (Jewish Reconstructionist Synagogue v Incorporated Vil. of Roslyn Harbor, 38 NY2d 283 [1975], rearg denied 39 NY2d 743 [1976], cert denied 426 US 950); a school and meeting room at a church (Matter of Diocese of Rochester v Planning Bd., 1 NY2d 508 [1956]); a day-care center (Matter of Unitarian Universalist Church v Shorten, 63 Misc 2d 978 [Sup Ct, Nassau County 1970]); a drug program (Slevin v Long Is. Jewish Med. Center, 66 Misc 2d 312 [Sup Ct, Nassau County 1971]) as well as a temporary shelter for the homeless operated by a church, such as in the case at bar (St. John’s Evangelical Lutheran Church v City of Hoboken, 95 NJ Super 414, 479 A2d 935 [Hudson County 1983]).
Therefore, it is clear that the Church’s temporary homeless shelter sanctuary program is, as a matter of law, a permissible "accessory use” of the Church which is a protected activity under section 12-10 of the New York City Zoning Resolution and under the Church’s current certificate of occupancy. Accordingly, plaintiffs’ argument that the use of Church property as an emergency temporary shelter for the homeless violates the applicable Zoning Resolution and its certificate of occupancy is without merit.
Plaintiffs’ argument that the Church is operating a "hotel or motel for transients,” contrary to its certificate of occupancy and requiring a zoning variance, is also without merit. There is no allegation that living or sleeping accommodations are being rented, or that provisions exist for a 24-hour desk, bellboy or telephone service. Under Zoning Resolution § 12-10, such factors are the sine qua non of a "hotel” (see also, Black’s Law Dictionary [rev 4th ed] [which defines a "hotel” as "a house which is held out to well-behaved members of the traveling public, who are willing to pay reasonable rates for accommodations, as a place where they will be received and entertained as guests for compensation, and will be furnished with food, drink, and lodging, and everything *508 which they have occasion for while on their way”; emphasis added]).
To the extent that the first and second causes of action allege violations of the Zoning Resolution and certificate of occupancy, the court finds, as a matter of law, that such allegations fail to state causes of action. Accordingly, the defendants’ cross motions to dismiss those branches of the first and second causes of action are granted.
Regarding the remaining branches of the first and second causes of action which allege violations of the SEQRA and CEQR and regulations thereunder, plaintiffs argue that pursuant to SEQRA and CEQR, the city was required to file an EIS prior to providing funding — whether directly or indirectly — to the Church. In support of this contention, plaintiffs claim that, since the city’s actions affect the "existing patterns of population concentration, distribution or growth and existing community or neighborhood character” (ECL 8-0105 [6]; emphasis added) the city must comply with the requirements of SEQRA before undertaking an "action” within the meaning of the statute.
ECL 8-0105 (4) defines "actions” to include: "(i) projects or activities directly undertaken by any agency; or projects or activities supported in whole or part through contracts, grants, subsidies, loans, or other forms of funding assistance from one or more agencies”. The State regulations implementing SEQRA in 6 NYCRR 617.2 (b) define "actions” that fall within the statutory purview to be
"(1) * * * activities that may affect the environment by changing the use * * * of any * * * structure, that * * *
"(ii) involve funding by an agency”.
CEQR also defines "action” consistent with the foregoing (see, Midtown S. Preservation & Dev. Comm. v City of New York, 130 AD2d 385, 387 [1st Dept 1987]).
In the case at bar, plaintiffs claim, in the branches of the first and second causes of action alleging city violations of SEQRA and CEQR, that a city agency, HRA, by its actions, has directly undertaken the funding of this Church homeless program through contracts and other funding assistance forms from one or more city agencies. Hence, plaintiffs argue that HRA is required to conduct and prepare an EIS prior to the implementation of this city policy.
This court finds, under the circumstances herein, that *509 the actions by the HRA constitute a temporary emergency activity involving the homeless crisis in this city and, as such, are exempt from the preparation of an EIS, even if this emergency has existed for a significant period of time (Midtown S. Preservation & Dev. Comm. v City of New York, supra; see also, Spring-Gar Community Civic Assn. v Homes for the Homeless, 149 AD2d 581 [2d Dept 1989]; Matter of Silver v Koch, 137 AD2d 467 [1st Dept 1988]). "Nor is it evident that finding shelter for homeless families is the sort of action contemplated by SEQRA such that an EIS is mandated.” (Midtown S. Preservation & Dev. Comm. v City of New York, supra, at 388.)
The Appellate Division, Second Department, has expressly recognized that "an emergency situation currently exists in New York City with regard to the defendant city’s legal and moral obligation to shelter a growing number of homeless families” (Spring-Gar Community Civic Assn. v Homes for the Homeless, supra, at 582). The appellate court further found that the "statutory provisions requiring review of the potential environmental impacts of governmental actions contain a specific exemption for 'emergency actions which are immediately necessary on a limited and temporary basis for the protection or preservation of life [and] health’ (6 NYCRR 617.2 [q] [4]; CEQR §4 [h] * * *).” (Supra, at 582.) On this basis, the complaint, which sought injunctive relief against the use of premises as a residential facility for homeless families, was dismissed by the appellate court. The Appellate Division, First Department, in an action involving the temporary mooring of a prison barge, similarly determined that the provisions of SEQRA and CEQR specifically provided an exemption from the preparation of an EIS on the ground that the prison barge qualified as an emergency action pursuant to 6 NYCRR 617.2 (q) (4) and CEQR § 4 (h) (Matter of Silver v Koch, supra).
Moreover, this court finds that the HRA funding herein through a contract which provides limited supplies to the Church, constitutes a Type II action. Pursuant to 6 NYCRR 617.13 (d) (15), a Type II action, relevantly encompasses "routine or continuing agency administration and management, not including new programs or major reordering of priorities”, and as such is exempt from the requirement of preparing an EIS (see also, 6 NYCRR 617.3 [j]). Under an analogous provision of CEQR (NY City Executive Order No. 91) § 15, Type II (a), such Type II actions are likewise exempted from the preparation of an EIS (see also, Matter of Upper E. Side *510 Coalition [Board of Estimate], NYLJ, Aug. 2, 1989, at 17, col 5 [Sup Ct, NY County]).
Therefore, as a matter of law, those branches of the first and second causes of action alleging violations of SEQRA and CEQR by the city defendants are without merit and legally insufficient and those portions of said causes of action are dismissed. Accordingly, as plaintiffs apparently have withdrawn their claim based on a violation of section 43 (11) of the Social Services Law pursuant to the city’s representation that no funds under this section were used for this program, the first and second causes of action are dismissed in their entirety.
The third cause of action alleges that the conduct of the Church and the Partnership in operating the emergency homeless shelter program constitutes a private nuisance. "A private nuisance threatens one person or a relatively few (McFarlane v City of Niagara Falls, 247 NY 340, 344), an essential feature being an interference with the use or enjoyment of land (Blessington v McCrory Stores Corp., 198 Misc 291, 299, affd 279 App Div 806, affd 305 NY 140). It is actionable by the individual person or persons whose rights have been disturbed” (Copart Indus. v Consolidated Edison Co., 41 NY2d 564, 568 [1977], rearg denied 42 NY2d 1102 [1977]). In order to state a cause of action for private nuisance, plaintiff must allege the following elements: "(1) an interference substantial in nature; (2) intentional in origin; (3) unreasonable in character; (4) with a person’s property right to use and enjoy land, (5) caused by another’s conduct in acting or failure to act” (41 NY2d, supra, at 570 [emphasis added]).
In the case at bar, plaintiffs have failed to allege that the purported interference with their right to use and enjoy their property was substantial in nature. Moreover, the complaint is bereft of the requisite element that the Church intended to interfere with plaintiffs’ right to use and enjoy their property. " ’An invasion of another’s interest in the use and enjoyment of land is intentional when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct’ (Restatement, Torts, § 825; McKenna v Allied Chem. & Dye Corp., 8 AD2d 463, 467; see Richardson, Evidence [10 ed], §90)” (Copart Indus. v Consolidated Edison Co., supra, at 571). Nor have plaintiffs alleged that defendants’ actions are unreasonable.
*511 Accordingly, the third cause of action is legally insufficient. Those branches of the cross motions seeking dismissal of the third cause of action are granted and the third cause of action is dismissed.
The fourth cause of action alleges that the conduct of the Church and the Partnership constitute a public nuisance. "A public * * * nuisance is an offense against the State and is subject to abatement or prosecution on application of the proper governmental agency (Restatement, Torts, notes preceding § 822, p 217; see Penal Law, § 240.45). It consists of conduct or omissions which offend, interfere with or cause damage to the public in the exercise of rights common to all (New York Trap Rock Corp. v Town of Clarkston, 299 NY 77, 80), in a manner such as to offend public morals, interfere with use by the public of a public place or endanger or injure the property, health, safety or comfort of a considerable number of persons (Melker v City of New York, 190 NY 481, 488; Restatement, Torts, notes preceding § 822, p 217)” (Copart Indus. v Consolidated Edison Co., supra, at 568).
In the case at bar, there is no allegation that the emergency temporary homeless shelter program offends, interferes with or causes damage to the general public-at-large in the exercise of rights common to all, nor that it offends public morals or interferes with the use by the public of a public place or endangers or injures the property, health, safety or comfort of a considerable number of persons. Moreover, the proper party to bring suit to abate a public nuisance is the Attorney-General or the chief executive officer of a county or town (Nassau Neuropsychiatric Socy. v Adelphi Univ., 18 NY2d 370, 375; Graceland Corp. v Consolidated Laundries Corp., 7 AD2d 89, 91 [1st Dept 1958]).
Accordingly, those branches of the cross motions seeking dismissal of the fourth cause of action are granted and the fourth cause of action is dismissed. The fifth cause of action, which appears duplicative of the previous causes of action, is likewise dismissed.
To the extent that plaintiffs seek injunctive relief enjoining the Church and the Partnership from operating the homeless shelter until all laws, rules and regulations are complied with, they have failed to demonstrate a clear right to the relief sought based upon the undisputed facts. Nor have plaintiffs demonstrated any injury, let alone irreparable injury to them, arising from the continued operation of the *512 homeless shelter accommodating 10 single men three nights a week. Plaintiffs’ claim of irreparable harm is based solely on speculative fears of crime, drugs and diminution of property values. Finally, plaintiffs have failed to show that a balancing of the equities lies in their favor. To the contrary, a balancing of the equities lies decidedly in favor of defendants’ continued operation of this homeless shelter.
Accordingly, that branch of plaintiffs’ motion for temporary injunctive relief and the injunctive relief sought in the underlying action to enjoin defendants from operating the homeless shelter is denied in its entirety. The cross motions by defendants to dismiss the complaint for failure to state causes of action as against them is granted and the complaint is dismissed.

 The Condominium is the former parish house immediately adjacent to the Church. For reasons of economic necessity, it was sold by the Church in 1967 to a private developer who converted it into luxury condominium apartments. The proceeds of the sale have been used by the Church to underwrite its continuing ministry to the community.