OPINION OF THE COURT

Per Curiam.

We are urged on this appeal to reverse the determination of the Appellate Division and to enjoin respondents from implementing their proposal to convert and use the Brig at the Brooklyn Navy Yard as a medium security prison.
After a Federal District Court order enforcing capacity limits on detention facilities of the City of New York had resulted in the premature release by the City Department of Correction of 613 detainees in November, 1983, in early December the City embarked on a plan by which it would add 1,400 beds to its facilities during the year 1984 by establishing 400 spaces in a Federal Government-owned facility known as “the Brig” (opposite the Brooklyn Navy Yard), then being used by the United States Immigration and Naturalization Service for the detention of illegal aliens, together with the construction of 760 units in *89 prefabricated modular buildings on Rikers Island and the expansion of existing Rikers Island dormitories by 240 units. The United States Government had indicated its willingness to grant the City a short-term license on space at the Brig looking toward sale of the facility to the City.
Conscious of the existence of a need rapidly to effectuate the expansion of detention facilities in order to prevent further premature release of detainees as a result of prison overcrowding and determining that the shortage of detention facilities created a hazard to life and safety, on December 30,1983 the Board of Estimate approved an emergency construction program involving the award of contracts for necessary renovation of the Brig at a cost of $20,915,000, voting to exempt the contracts from public bid requirements in order to expedite the program. On February 1, 1984 the City Department of Correction officially declared the existence of an emergency as to detention facilities. On the same day the City obtained from the United States Government a revocable license permitting it to have access to the Brig for a six-month period commencing January 27,1984 for the purpose of renovation and temporary occupancy of the facility pending the anticipated negotiated sale of the property to the City Department of Correction at its assessed value. The license was made subject to the continuing needs of the Immigration and Naturalization Service, the operations of which were not to be disrupted by the City as long as the Service continued to occupy and operate portions of the property. It was also made terminable upon 30 days’ notice.
On February 15, 1984 the City filed a project data statement with respect to its purchase of the Brig, a first step under the City Environmental Quality Review procedures (CEQR), and on February 23,1984 a land use review application under the Uniform Land Use Review Procedure (ULURP), was filed with the Department of City Planning and on March 5,1984 was forwarded to Community Planning Board No. 2.
During the period of these filings and from the day following receipt of the license to use the Brig, renovation work has been carried forward with the objective of making 200 beds available by May 1 and an additional 200 beds *90 available by June 1. On March 2, 1984 this article 78 proceeding was instituted against the Mayor and various City officials by residents and three associations of the area near the Brig and the Community Board within whose jurisdiction the facility is located, seeking to prevent further work on the project. The petition alleged that the action of the Board of Estimate on December 30, 1983 approving the project was in excess of authority and illegal because of a failure by the City to have completed procedures said to be required by ULURP and CEQR. Specifically, petitioners claimed that the City had gone ahead with the project, which they asserted was a “[s]ite selection for capital projects” under section 197-c (subd a, par [5]) of the New York City Charter, which ULURP required to be submitted for consideration and hearing by the Community Board, followed by submission of its written recommendations to the City Planning Commission, before approval of the project could be given by the Board of Estimate. With respect to CEQR, it was petitioners’ position that the City had acted without filing a necessary environmental impact statement. Ancillary to the article 78 proceeding petitioners sought a preliminary injunction to halt further work on the project.
A week after the proceeding had been instituted a “negative declaration” as to the project was issued by the City’s Department of Environmental Protection and the Department of City Planning, declaring that the renovation and use of the Brig would not have a significant effect on the environment, which under CEQR had the effect of eliminating any need for the filing of an environmental impact statement.
This litigation came on for expedited consideration on March 16, 1984, and on April 19, 1984 Special Term of Supreme Court issued an order enjoining further activities in furtherance of the renovation until completion of procedures under ULURP and CEQR, finding that the City could not properly continue with the project until it had “been aired through the procedural labyrinth mandated by law”. The court concluded that, as to ULURP, the Community Board had not been allowed an opportunity to make its recommendations known prior to approval of what the *91 court regarded as a site selection for a capital project within the provisions of ULURP. As to the environmental review provided for by CEQR, the court found that the absence of an environmental impact statement barred continuation of work on the renovation. With respect to the negative declaration which had been issued on March 9, it observed that there was nothing in the record to indicate that an evaluation of relevant factors had preceded the issuance of that declaration.
On the City’s appeal, the Appellate Division unanimously reversed the judgment of Supreme Court and dismissed the proceeding on the merits. It concluded that the declaration of emergency issued by the Department of Correction on February 1, 1984 — which it characterized as “clearly not irrational, arbitrary or capricious”, given the critical jail capacity situation — served to permit renovation work pending completion of CEQR procedures in view of a provision of CEQR authorizing commencement of work in such circumstances. It also noted its disagreement with Supreme Court’s finding that the negative declaration was deficient, although it expressly made no determination as to the reasonableness of the declaration.
As to compliance with ULURP, the court found that the revocable license received by the City from the Federal Government and its use of the Brig prior to the impending sale did not fall within the matters subject to ULURP, either as a disposition of real property to the City under section 197-c (subd a, par [10]) of the New York City Charter or as a site selection for a capital project under paragraph (5) of the same subdivision. It also observed that, in any event, as to the proposed purchase of the property, the ULURP application had already been submitted to the local Community Board.
Petitioners are now before us on an appeal as of right.
ULURP
The principal argument advanced by petitioners in our court as ground for reversal of the order of the Appellate Division and for the issuance of injunctive relief in their favor is the asserted failure of respondents to have complied with the requirements of ULURP. It is acknowledged, as it must be, that if compliance with the procedural *92 mandates of ULURP is required with respect to the license obtained by the City from the Federal Government to occupy, renovate, and use the Brig and for the renovation so far completed, there has been a failure of compliance. It is respondents’ contention that these actions on their part do not fall within the embrace of ULURP. Petitioners, on the other hand, ground their arguments to the contrary on either or both of paragraphs (5) and (10) of subdivision a of section 197-c of the Charter. Paragraph (5) extends the mandates of ULURP to “Site selection for capital projects”; paragraph (10), so far as presently pertinent, extends those mandates to “Sale, lease, other than the lease of office space, exchange, or other disposition of real property to the city”.
We agree with the Appellate Division that the license obtained by the City from the Federal Government for occupancy and use by the City of the Brig is not a “lease” or such a “disposition of real property to the city” as to fall within the scope of paragraph (10) (cf. Mauldin v New York City Tr. Auth., 64 AD2d 114).
Whether the execution of that license falls within the ambit of paragraph (5) as a “[s]ite selection for capital projects” is a much more troublesome problem. Supreme Court answered the question in the affirmative; the Appellate Division, in the negative.
The Board of Estimate approved the award of contracts for the project on December 30, 1983, in an amount of $20,915,000. We are informed that by administrative action the City later allocated this amount to line items in the capital budget, principally those of the Correction Department.
The Charter defines a capital project as “[ajny physical public betterment or improvement or any preliminary studies and surveys relative thereto” (§ 211, subd 1, par [a]). The argument of respondents that there must be an acquisition of land to come within paragraph (5) must be rejected; if this were so there would be no occasion for the provisions of that paragraph in view of the provisions of paragraph (10).
*93 We perceive no escape from the conclusion that the execution of the license for occupancy of the Brig by the City for the purposes intended constituted a “[s]ite selection for [a] capital project”, thereby activating the obligation of respondents to comply with the mandates of ULURP.*
CEQR
In our court petitioners do not press their earlier contentions that respondents are in violation of the prescriptions of the CEQR procedures established by New York City Executive Order No. 91 of August 24,1977 to parallel and implement the provisions of the State Environmental Quality Review Act (ECL 8-0101 et seq.). As stated above, when the proposed project for conversion of the Brig was initiated, respondents sought to bring themselves within the prescriptions, including the emergency section (Executive Order No. 91, § 4 [h]), of CEQR. On March 9, 1984, shortly after the institution of the present proceeding, however, the Departments of Environmental Protection and of City Planning, the two lead agencies, filed a negative declaration manifesting their determination that the proposed project is not an exempt action or a Type II action pursuant to sections 4 and 5 of Executive Order No. 91 and that it will not have a significant effect on the environment (Executive Order No. 91, § 7 [b] [1]). By that action respondents changed their course from one of proceeding in asserted conformity with CEQR to one of declaring that the proposed project was not subject to the environmental assessment procedures of CEQR.
In view of this development, judicial examination of steps earlier taken in purported compliance with the requirements of CEQR has in effect been rendered academic. Respondents are now proceeding on the asserted premise that they are excused from further compliance with CEQR mandates. Judicial scrutiny as to petitioners’ right to in-junctive relief can only be focused, therefore, on the validity of the negative declaration.
The present proceeding, however, was instituted prior to the issuance of the negative declaration and, as the Appel *94 late Division recognized, the record before us is wholly insufficient for any judicial determination of petitioners’ challenge to that declaration. Petitioners have not established their right to injunctive relief at the present time on this ground, nor could they in view of the state of the record and the procedural posture in which this case reaches us. Our disposition of the present appeal, therefore, is without prejudice to petitioners’ right, if they be so advised, to institute another proceeding to obtain judicial scrutiny of the validity of the negative declaration of March 9, 1984.
THE REMEDY
At the outset of our consideration of the remedies to which petitioners may be entitled in the circumstances, we observe that with respect to the acquisition of title to the Brig and the permanent aspects of the project, respondents are now proceeding with due respect for the mandates of CEQR and ULURP. As to CEQR, a negative declaration has been issued as permitted by Executive Order No. 91, and respondents take the position that in consequence thereof they are free from the environmental assessment procedures of the Order. As stated above, the merit of their position in that regard — beyond the reach of the present proceeding — can be subjected to judicial review in another proceeding if that be desired. As to ULURP, on March 5 the Department of City Planning forwarded a land use review application with respect to the outright purchase of the Brig from the Federal Government to Community Planning Board No. 2 for hearing and comment in conformity with the requirement of ULURP (NY City Charter, § 197-c, subd b). We have no reason to believe that having duly started on their ULURP course respondents will not now continue to conform to the requirements of the Charter.
There then remains for our consideration what relief, if any, petitioners are entitled to at this time in this proceeding in consequence of our conclusion that the execution of the preliminary license for use of the Brig was in violation of ULURP prescriptions. Before us, petitioners seek “an order * * * restraining the City from utilizing or further constructing this jail until such time as it has complied with its lawful obligations.”
Injunctive relief, which had its origins in the courts of equity, has always been perceived as discretionary, to be *95 granted or withheld by our courts in the exercise of responsible judicial discretion (Kane v Walsh, 295 NY 198, 205). The determination of the availability of such relief depends not alone on the right of the party seeking it but as well on the appropriateness of its issuance in the circumstances in which it is sought.
We turn then to the present circumstances in which petitioners seek injunctive relief at our hands. The City’s license of the Brig is an accomplished fact, fully recognized by both the City and the Federal Government. Similarly, we are informed that renovation of the Brig for the receipt of 200 prisoners has now been completed and that their transfer is held up only in consequence of the outstanding stay issued by our court on May 10, 1984. We take note that respondents are confronted, in consequence of orders of the Federal courts and otherwise, with an emergency of compelling and dangerous dimension and seriousness. That this emergency might have been foreseen and that municipal officials may have been derelict in not earlier having made appropriate provision for its resolution and having assured the availability of adequate detention facilities does not negate the existence of the present crisis. Inaction of the past may have been justifiable or at least explainable; in any event the calendar cannot be turned back. It would serve no appropriate or useful purpose now to fashion relief as a sanction for action and inaction beyond recall.
Focusing on the present compelling need of the City to make additional detention facilities immediately available and the evident desire on all sides to avoid a repetition of the premature release in November, 1983 of 613 detainees, it would be an abuse of discretion on our part to preclude the immediate use by the City of detention facilities which are now ready and available. For us to mandate that such facilities stand vacant pending resolution of the continuing controversy between the parties would be judicially irresponsible in view of the dangerously close approach of the inmate population to mandated limits. We recognize the fact that “the dynamics and freedom of decision-making with respect to a proposal to rescind a prior action are significantly more constrained than when the action is *96 first under consideration for adoption” (Matter of Tri-County Taxpayers Assn. v Town Bd., 55 NY2d 41, 46), and that full and fair evaluation of the merits of any project may be more difficult after that project has been permitted to progress through substantial implementation. Nonetheless, in the singular circumstances with which we are all confronted on this appeal, we conclude that injunctive relief should be denied and petitioners relegated to seek such judicial review and relief as they may desire and as may be available with respect to the negative declaration of March 9, 1984 and the land use review application forwarded to Community Planning Board No. 2 on March 5, 1984.
For the reasons stated, the order of the Appellate Division which denied petitioners’ prayer for injunctive relief and dismissed the petition should be affirmed, without costs, and the stay previously granted vacated.
Judges Jasen, Jones, Wachtler, Meyer, Simons and Kaye concur in Per Curiam opinion; Chief Judge Cooke taking no part.
Order affirmed, without costs, and the stay issued by this court on May 10, 1984 is vacated.

 We observe that no exceptional provisions for emergency situations are to be found in ULURP comparable to those in CEQR (Executive Order No. 91, § 4 [h]).